# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Michael S. Becker,

       Plaintiff,

v.                                     Case No. 1:03cv875

Rapidigm, Inc,                     Judge Michael H. Watson

       Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

      This matter is before the Court upon Plaintiff Michael S. Becker's Motion for Partial Summary Judgment (Doc. 33) and Defendant Rapidigm, Inc.'s Motion for Summary Judgment.  (Doc. 34)  Both motions have been fully briefed (Docs. 37, 38, 39, 40) and are now ripe for review.  Also pending before the Court is Defendant's Motion to Strike Affidavit of Michael Becker and "Chronology of Key Events."  (Doc. 36)  This motion has also been fully briefed (Docs. 39, 41) and is also ripe for review.

      For the reasons stated herein, Defendant's Motion to Strike Affidavit of Michael Becker and "Chronology of Key Events" is GRANTED in part, DENIED in part; Plaintiff's Motion for Summary Judgment is DENIED; and Defendants' Motion for Summary Judgment is DENIED.

## I.    FACTUAL BACKGROUND

      Becker began working for Rapidigm in 1998.  (Doc. 45, Michael Becker Depo. at 30)  The parties signed an employment agreement dated July 24, 1998.  (Id., Ex. 2)  The agreement provided that Becker's employment was at-will.  (Id.)  Becker was to serve as

"PeopleSoft Practice Director." (Id.) The PeopleSoft Practice was to provide consulting services to the users of the PeopleSoft software nationwide. (Doc. 1, ¶ 4) Before Becker was hired, Rapidigm already had technology consultants doing PeopleSoft work, but it did not have a formal PeopleSoft practice. (Doc. 45, Lew Wheeler Depo. 47-48) Becker was to be paid a monthly salary and a payment under a "commission plan" which was outlined in an "Addendum A" attached to the contract. (Becker Depo., Ex. 2) Addendum A provides that after six months, Becker's base salary will be reduced and he would "receive 10% of the net profit of the PeopleSoft Practice." (Id.) Becker understood this not to mean a sales commission, but was instead ten percent of "the total practice profitability." (Id. at 33) At Rapidigm, this bonus was known as "executive compensation." (Doc. 45, Kevin Cotter Depo. at 23-24)

In 1999, Rapidigm began providing revenue statements to practice directors. (Id. at 21) Revenue from the practices was based on information collected from timesheets. (Id. at 33) However, within the PeopleSoft Practice, Kevin Cotter, Rapidigm's Controller, made a distinction between "in practice" jobs where the PeopleSoft Practice was involved in making the sale or placing the consultants, and "out of practice" jobs where the PeopleSoft Practice was not involved. (Id. at 44) This distinction was made by using a separate code for out of practice jobs. (Id., Ex 3) The branch offices determined which code should be used. (Id. at 45)

Rapidigm explains that this arrangement was based on the belief that it would be unfair to shift revenue to the practice from PeopleSoft consultants who were working for Rapidigm before the practice group began. (Wheeler Depo. 47-48)

Becker objected to the out of practice distinction on several occasions. For

2

example, in the early part of 1999, the parties began negotiating a new compensation plan for Becker.  (Id. at 85-86)  Harry Lusky, who oversaw Rapidigm's Ohio offices, sent Becker a draft of the agreement via email.  (Id. at 86)  Becker made "redline" changes and comments and sent the document back to Lusky.  (Id. 90)  The original agreement limited revenue to "people and projects you helped sell or participated in."  (Id.)  Becker changed this language so that revenue would be based on "the entire practice above August 1998 levels."  (Id., Ex. 9)  Becker commented: "This has to be a global practice measurement. If I am supporting the entire practice, then this measurement needs to incorporate the entire practice."  (Id.)  Becker commented further that his efforts should not be tied specifically to transactions.  (Id.)  On March 19, 1999, Lusky responded to Becker's comments via email and sent another version of the agreement which provided for revenue to be based on "all consultants that are coded as PeopleSoft practioners."  (Id., Ex. 10)

On March 29, 1999, Cotter sent an email directing employees to discontinue use of the out of practice distinction when coding jobs.  (Wheeler Depo., Ex. 13)  Soon thereafter, Jeff Schuett was also hired as a national practice director for the PeopleSoft Practice.  (Becker Depo. at 133-34)  After some negotiations, it was agreed that Schuett and Becker would split the PeopleSoft Practice profitability so that each would receive five percent of the nationwide profitability as executive compensation.  (Becker Depo. at 158) In April or May of 1999, Becker first noticed that the out of practice code was still being used.  (Id. at 210-11)

On June 24, 1999, Becker received a draft of his employment agreement.  (Id. at 221-22)  The draft agreement provided that Becker would be paid "5% of the net profits of the PeopleSoft Practice commencing January 1, 1999."  (Id., Ex. 25)  Becker refused to

sign the agreement because the out of practice issue had not been resolved.  (Id. at 239-240)

On July 22, 1999, Cotter sent another email instructing employees to eliminate the out of practice distinction for all jobs starting after April 1, 1999.  (Becker Depo., Ex. 26) Within one week of the email, Paul Freudenberg, president of Rapidgim, decided that the distinction would not be eliminated and the change was never implemented during Becker's employment.  (Doc. 45, Paul Freudenberg Depo. 66-69; Cotter Depo. at 72-73)

Executive compensation was to be paid on a quarterly basis.  (Becker Depo. at 250) At the end of July of 1999, Becker received his first executive compensation payment.  (Id. at 246-47)  The amount did not match the profitability statements and the change to the out of practice coding.  (Id.)  Becker communicated this to Cotter and Tom Rector.  (Id.) Becker does not recall if he deposited this first check or if he sent it back for an adjustment to his 401(k) plan.  (Id. at 247)  Even though Rector assured Becker in December of 1999 that the coding changes had been made, Becker received other checks for executive compensation which did not include out of practice profits.  (Id. at 272, 273-74)  The profitability statements were inconsistent in including out of practice profits because some branch offices made changes to the coding, and others did not.  (Id. at 273)

On August 30, 1999, Becker signed a revised employment agreement which did not refer to the in practice or out of practice distinction, but provided that in addition to his base salary, Becker would receive "5% of the net profits of the PeopleSoft Practice commencing January 1, 1999.  (Becker Depo., Ex. 32) "Net profits" and "PeopleSoft Practice" are not defined in the agreement.  (Id. at 224, 226)

4

On January 13, 2000, Becker received a copy of a proposed compensation plan which was to take effect on February 1, 2000.  (Becker Depo., Exs. 37, 42)  The plan included the in practice and out of practice distinction.  (Id.)  The plan was adopted in March of 2000.  (Id., Ex. 43)

Employees continued to use the out of practice code in 2000, 2001, and 2002.  (Becker Depo. at 305; see also Becker Depo., Exs. 35, 44)  Becker explains that the practice director's compensation was an expense allocated to the branch offices, and therefore if the practice director's compensation was higher, the profitability of the branch office was lower.  (Id. at 258)  Because the branch managers' compensation was tied to the profitability of their office, the branch managers opposed the elimination of the out of practice distinction.  (Id. at 256)

Becker testified that in 2002 he got an agreement that the out of practice distinction would be eliminated going forward.  (Id. at 303-304)  However, Becker stated that this agreement was not executed.  (Id. at 305)

Though Becker continued to lobby for the elimination of the distinction, he accepted executive compensation payments which were based on in practice income only.  (Id. at 249-250, 272-74, Ex. 46, 61)  Becker thought that Rapidigm would work through changing the codes and "settle up later."  (Id. at 220)

Rapidigm fired Becker in April of 2002.  (Id. at 415-16)

Becker brings this action for breach of contract.  (Doc. 1)  Becker's claim is limited to the 1999 contract between the parties.  Becker claims that he is entitled to five percent of the total practice profitability for the period January 1, 1999 to May 9, 2002.

II.     **ARGUMENTS OF THE PARTIES**

A.      Becker's Motion for Partial Summary Judgment.

Becker argues that he is entitled to summary judgment on liability because he has established (1) the existence of a contract; (2) the terms of the contract are clear and unambiguous; (3) he performed his contractual obligations; and (4) Rapidigm breached the 1999 Contract when it artificially and wrongfully shaved down the profitability numbers upon which Becker's executive compensations was based.

In response, Rapidigm first argues that the parties' contract does not contain the alleged promise that Becker is seeking to enforce; and this Court cannot consider extrinsic evidence to alter or add terms to the contract.  Rapidigm next argues that Becker has waived or is estopped from asserting his claim.  In the alternative, Rapidigm argues that the contract is ambiguous, but  that no reasonable jury could find for Becker based on the parties' course of dealing and the circumstances surrounding the execution of Becker's employment agreement.

B.      Rapidigm's Motion to Strike.

Rapidigm argues that the affidavit by Becker which is attached in support of Becker's Motion for Partial Summary Judgment should be struck because it contains hearsay, speculation, conclusions, and argument.  Rapidigm also maintains that portions of Becker's affidavit contradict his deposition testimony.   Rapidigm argues that the "Chronology of Key Events" attached to Becker's Motion is an unsworn statement which cannot be considered according to Federal Rule of Civil Procedure 56(e).

C       Rapidigm's Motion for Summary Judgment.

Rapidigm argues that the undisputed facts establish that Becker cannot recover on his claim.  Rapidigm maintains that the 1999 contract unambiguously expresses the

parties' intent to maintain the *status quo* with respect to the calculation and payment of Becker's executive compensation. Rapidigm also argues that since Becker was an at-will employee, Rapidigm could modify his compensation and terms of employment at any time. Rapidigm states that Becker's continued employment and acceptance of the benefits of employment after the revocation of the elimination of the in practice and out of practice distinction constituted an acceptance of the revised employment terms. Finally, Rapidigm argues that to the extent that Becker had a contractual right to additional executive compensation, he waived that right because he was on notice that the in practice and out of practice distinction had not been eliminated.

### III.  ANALYSIS

#### A.  Motion to Strike.

Federal Rule of Civil Procedure 56(e) requires that affidavits that are used in support of summary judgment must be based on personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. In general, hearsay may not be used to support a motion for summary judgment. *Farra v. General Motors Corp.*, 163 F.Supp.2d 894, 903 (S.D.Ohio 2001), *quoting*, *Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment."). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

Rapidigm makes a general argument, without elaboration, that paragraphs 6, 10, 11, and 13 contain hearsay statements. While paragraph six states "there was talk of making me responsible only for the eastern half of the United States . . . ," this statement is not being presented for the truth of the matter asserted. Instead, Becker is explaining

7

the basis for his objection. In paragraph ten, Becker states that "Cotter told the branch managers what they were supposed to do . . ." However, in the same paragraph, Becker explains that Cotter's directive was contained in an July 22, 1999 email. Becker's summary of Cotter's actions is not a basis for excluding this statement. The July 22, 1999 email has been presented to the Court in the course of briefing the motions for summary judgment, and would clearly be admissible as evidence at trial. Next, paragraph eleven states: "Instead, [the branch managers] lobbied Lew Wheeler, the CEO of Rapidigm, to reinstate the PeopleSoft 'out of practice' code." Based on the Court's review of Becker's deposition, and the context of this statement, the Court finds that this is Becker's understanding of why the out of practice code continued to be used. As such, it is not an out of court statement which would bring it within the definition of hearsay. Moreover, Wheeler himself testified that he received complaints from office managers, and that was the reason the change was never implemented. (Wheeler Depo. at 30) Finally, in paragraph thirteen, Becker explains that Ravi Amble told him on several occasions that the out of practice coding problem would be corrected. Becker is not offering this statement for the truth of the matter asserted - that the code would in fact be corrected - but to show that Becker believed that the problem would be corrected at some point. Therefore, the Becker affidavit will not be stricken on the basis of hearsay.

While affidavits containing mere conclusions have no probative value, *see In re Arnold*, 76 B.R. 109, 110 (Bkrtcy. S.D.Ohio 1987), *citing*, *Benton-Volvo-Metairie, Inc. v. Volvo Southwest, Inc.*, 479 F.2d 135, 139 (5th Cir.1973) *and Gordon v. Terry*, 684 F.2d 736, 744 (11th Cir.1982), this is not a basis upon which to exclude an affidavit.

Finally, the Court acknowledges that portions of Becker's affidavit include speculation and argument on his part. However, the Court finds that this speculation and

argument is based upon is based upon Becker's personal knowledge, and therefore meets the requirements of Fed.R.Civ.P. 56 (e).  To the extent that any of Becker's statements are unsupported and create genuine issues of material fact, the Court is confident that after a careful review of the record, the Court will be able to exclude these statements from its consideration.

Rapidigm also argues that portions of Becker's affidavit contradict his deposition testimony. It is well-settled that a party who has been examined at length at deposition cannot create a genuine issue of material fact by later submitting an affidavit that contradicts previously sworn testimony.  *Penny v. United Parcel Serv.*, 128 F.3d 408, 416 (6th Cir.1997); *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986).  However, Rapidigm again only makes general references to Becker's affidavit, and instead of citing directly to Becker's deposition testimony, cites generally to its own Response to Plaintiff's Motion for Partial Summary Judgment.  Rapidigm's main contention seems to be that Becker testified in his deposition that he was informed that the out of practice distinction would be not be eliminated, but in his affidavit Becker states that no one ever told him that the out of practice code was never eliminated.  In searching Rapidigm's Response, the Court located a footnote where Rapidigm makes a reference to Becker's testimony that he "guessed" that it was Ravi Amble who told him that "that is the way it is."  (Becker Depo. at 352-53)  In reviewing the deposition testimony and Exhibit 61, which corresponds to the testimony, the Court finds that Becker's affidavit does not contradict his earlier deposition testimony.  Exhibit 61 is an December 22, 2000 email from Becker to Cotter and Amble which states:

> Since it appears that the PeopleSoft Practice will keep the 'in-practice/out of practice distinction' (and I believe that the Oracle and SAP Practices have no such distinction) . . . I would also like someone to explain to me from a

> business perspective why we still insist on the in-practice/out of practice
> distinction for the PeopleSoft Practice and not the SAP or Oracle Practices.
> It is unacceptable to simply be told - that is the way it is - since I can make
> a fairly strong case for why it is counterproductive.

(Becker Depo., Ex. 61)  The Court finds that the referenced testimony and exhibit does not show that Amble told Becker that the out of practice distinction was never eliminated. Moreover, there is evidence in the record that at certain points in time, Rapidigm did attempt to eliminate the distinction.  As such, there is no conflict with Becker's affidavit, and the Court will not strike his affidavit on that basis.

As to the "Chronology of Key Events," the Court finds that this is not a sworn statement, and makes no reference to deposition testimony, exhibits or other evidence in the record.  For that reason, "Chronology of Key Events," Exhibit A to Plaintiff's Motion for Partial Summary Judgment shall be stricken and not considered by the Court.  Accordingly, Defendant's Motion to Strike Affidavit of Michael Becker and "Chronology of Key Events" is GRANTED in part, DENIED in part.

B.    Motions for Summary Judgment.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a

scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

To prove a breach of contract under Ohio law, the following elements must be established: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff.  *Samadder v. DMF of Ohio, Inc*., 798 N.E.2d 1141 (2003).  To prove the existence of a valid contract, the plaintiff must prove all the essential elements of a contract, including an offer, acceptance, the manifestation of mutual assent, and consideration (the bargained for legal benefit and/or detriment). *Kostelnik v. Helper*, 770 N.E.2d 58 (2002). The plaintiff must also show that there was a "meeting of the minds" and that the contract was definite as to its essential terms. *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 575 N.E.2d 134, 137 (1991).

Here, the parties arguments are not focused on whether the 1999 Agreement was a valid contract.  Instead, the parties' arguments surround the interpretation of that contract.  Where the language of a contract is clear and unambiguous, the interpretation of that contract is a question of law for the court.  *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio*, 474 N.E.2d 271, 272-73 (Ohio 1984) (per curiam). Conversely, where the terms of a contract are ambiguous and indefinite, determining the intent and meaning of the parties becomes a question of fact for the jury. *Amstutz, Adm'r v. Prudential Ins. Co.*, 26 N.E.2d 454, 456 (Ohio 1940); *GenCorp, Inc. v. American Intern. Underwriters*, 178 F.3d 804, 818 (6th Cir. 1999).

A contract is ambiguous if it is susceptible to more than one reasonable interpretation. *American Druggists' Ins. Co. v. Equifax, Inc.*, 505 F.Supp. 66 (S.D.Ohio.

11

1980); *City of Hillsboro v. Fraternal Order of Police, Ohio Labor Council, Inc.*, 556 N.E.2d 1186 (Ohio 1990).  "In making the determination of whether language is ambiguous, courts must generally give words and phrases their plain, ordinary, natural or commonly accepted meaning." *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347 (Ohio 1982).  Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement.  *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (1992).  Parol evidence is admissible only if the terms of the contract are ambiguous and then only to interpret, but not to contradict, the express language.  *Ohio Historical Soc'y v. General Maintenance & Eng'g Co.*, 583 N.E.2d 340, 344 (Ohio 1989).

The 1999 Agreement provides that in addition to his base salary, Becker will receive "5% of the net profits of the PeopleSoft Practice commencing January 1, 1999." (Becker Depo., Ex. 32)  Rapidigm argues that this language is unambiguous, but states that it was the intent of the parties to not include out of practice profits in this amount.  As evidence of this intent, Rapidigm points to Becker's receipt of the payment of executive compensation which excluded out of practice revenue, and the parties' choice of language which was identical to the 1998 Agreement under which Becker was not paid for out of practice revenue.  Becker also argues that this contract term is unambiguous, but that it entitles Becker to five percent of the total practice profitability.  Becker also points to extrinsic evidence which shows that the parties intended this meaning.  Specifically, in negotiating the agreement, Becker repeatedly rejected proposed language which would have limited Becker to a percentage of the profits from projects where he was personally involved.

The Court finds that despite the parties arguments to the contrary, the contract term "5% of the net profits of the PeopleSoft Practice" is ambiguous.  It is not clear from the

contract language how "net profits of the PeopleSoft Practice" was to be calculated.  This ambiguity is in the form of a latent ambiguity:

> A latent ambiguity is a defect which does not appear on the face of language used or an instrument being considered.  It arises when language is clear and intelligible and suggests but a single meaning, but some intrinsic fact or some extraneous evidence creates a necessity for interpretation or a choice between two or more possible meanings, as where the words apply equally well to two or more different subjects or things.

*Conkle v. Conkle*, 285 N.E.2d 883, 887-888 (Ohio Ct. App.1972).   Where a latent ambiguity exists, extrinsic evidence may be offered to determine the intended meaning of the parties.  *Dorsey v. Contemporary OB-GYN, Inc.*, 680 N.E.2d 240, 245 (Ohio Ct. App. 1996).  However, "[s]ince latent ambiguity is disclosed by extrinsic evidence, it may be removed by such evidence." *Conkle*, 285 N.E.2d at 887.

Examination of extrinsic evidence does not necessarily preclude the granting of summary judgment.  As the Sixth Circuit has explained:

> Summary judgment may be appropriate even if ambiguity lurks as long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations. On the other hand, if the extrinsic evidence relevant to the interpretation of an ambiguous contractual provision is contested or contradictory, summary judgment will often be inappropriate.

*Gencorp*, 178 F.3d at 818-19, *quoting*, *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 33 (1st Cir. 1998).  Such extrinsic evidence may include (1) the surrounding circumstances of the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) acts by the parties that evidence the construction they gave to the agreement.  *Westbrock v. Western Ohio Health Care Corp.*, 738 N.E.2d 799, 806 (Ohio Ct. App. 2000).

Becker maintains that at the time he entered into the 1999 Agreement, Rapidigm employees had been instructed via the July, 1999 Cotter email to discontinue use of the

13

in practice and out of practice distinction.  Rapidigm does not argue that Becker knew the distinction was not going to be eliminated at the time the 1999 Agreement was entered into, but points out that Becker received commission and practice profitability statements that put him on notice that the distinction has not been eliminated and accepted payments of executive compensation which did not include out of practice profits.  Becker explains that while he accepted the payments, he continually protested the continued use of the distinction.  Rapidigm argues that Becker's protests were not consistent with the assertion of an existing contractual right to payment, but instead represented a campaign to secure prospective modifications to Rapidigm's compensation plan.

The Court finds that the extrinsic evidence offered by the parties supports more than one of the conflicting interpretations.  Therefore summary judgment is not appropriate.

Nevertheless, Rapidigm advances two arguments which, if found to be persuasive, would warrant a finding in its favor.

First, Rapidigm argues Becker was an at-will employee, and therefore Rapidigm could modify his compensation and terms of employment at any time.  Rapidigm states that Becker's continued employment and acceptance of the benefits of employment after the revocation of the elimination of the in practice and out of practice distinction constituted an acceptance of the revised employment terms.

In *Lake Land Emp. Group of Akron, LLC v. Columber*, 804 N.E.2d 27, 28 (Ohio 2004), the Ohio Supreme Court held that consideration exists to support a noncompetition agreement when, in exchange for the assent of an at-will employee to a proffered noncompetition agreement, the employer continues an at-will employment relationship that could legally be terminated without cause.  The court found that "forbearance on the part of an at-will employer from discharging an at-will employee serves as consideration to

14

support a noncompetition agreement." *Id.* at 31-32. The court reasoned that either an employer or an employee in an at-will relationship may propose to change the terms of their relationship at any time. *Id.* at 32. The court explained:

> If, for instance, an employer notifies an employee that the employee's compensation will be reduced, the employee's remedy, if dissatisfied, is to quit. Similarly, if the employee proposes to the employer that he deserves a raise and will no longer work at his current rate, the employer may either negotiate an increase or accept the loss of his employee. In either event the employee is entitled to be paid only for services already rendered pursuant to terms to which they both have agreed. Thus, mutual promises to employ and to be employed on an ongoing at-will basis, according to agreed terms, are supported by consideration: the promise of one serves as consideration for the promise of the other.

The court explained further that:

> The presentation of a noncompetition agreement by an employer to an at-will employee is, in effect, a proposal to renegotiate the terms of the parties' at-will employment. Where an employer makes such a proposal by presenting his employee with a noncompetition agreement and the employee assents to it, thereby accepting continued employment on new terms, consideration supporting the noncompetition agreement exists. The employee's assent to the agreement is given in exchange for forbearance on the part of the employer from terminating the employee.

*Id.* at 32.

While the decision in *Lake Land* makes it clear that continued employment can serve as consideration for a change in an at-will employee's employment relationship, it does not alter the requirement that oral or written modifications to an employment contract must satisfy the elements essential to contract formation. *See Helle v. Landmark, Inc.*, 472 N.E.2d 765, 773 (Ohio App. 1984). As stated above, in addition to consideration, these elements include offer, acceptance, and the manifestation of mutual assent.

Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance. *McSweeney v. Jackson*, 691 N.E.2d 303, 308 (Ohio Ct. App. 1996), *citing*, Restatement of the Law 2d, Contracts § 18 (1981). The Sixth

Circuit has found that under Ohio law, mutual assent can be manifested by continued employment after the employee has been told explicitly that the change in the employment relationship was a condition of employment.  *See Dantz v. American Apple Group, LLC*, 2005 WL 465253, *4 (6th Cir. March 1, 2005) (unpublished).  Here, there is no evidence that Rapidigm ever told Becker that payment of executive compensation which did not include out of practice profits was a condition of Becker's employment. (See Doc.33, Ex. B, Becker Aff. ¶ 14)  Moreover, there is no evidence that Rapidim made an offer to modify the 1999 Agreement.  *See Leaseway Distrib. Centers, Inc. v. Ohio Dept. of Adm. Serv.*, 550 N.E.2d 955, 961- 962 (Ohio Ct. App. 1988).  ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.")  Therefore, there is a genuine issue of material fact as to whether there was a manifestation of mutual assent to the modification of the 1999 Agreement.

Secondly, Rapidigm argues that even if the 1999 Agreement were found to entitle Becker to five percent of the total practice profitability, Becker has either waived the right to receive this compensation, or is estopped from asserting his claim to out of practice profits.

Under Ohio law, estoppel and waiver are separate and distinct doctrines.  *Chubb v. Ohio Bur. of Workers' Comp.*, 690 N.E.2d 1267, 1270 (Ohio 1998).  "Equitable estoppel prevents relief when one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment." *Id.*, *quoting*, *Chavis v. Sycamore City School Dist. Bd. of Educ.*, 641 N.E.2d 188, 196 (Ohio 1994).  Waiver is defined as the "voluntary relinquishment of a known right." *Hess v. Akron*, 7 N.E.2d 411, 413 (Ohio 1937). The party asserting waiver must prove a "clear,

16

unequivocal, decisive act of the party against whom the waiver is asserted, showing such a purpose or acts amounting to an estoppel on his part." *White Co. v. Canton Trans. Co.*, 2 N.E.2d 501, 505 (Ohio 1936).  Thus, estoppel involves the conduct of both parties, whereas waiver depends upon what one intends to do.  *Chubb*, 690 N.E.2d at 1270.  The Court finds that while Rapidigm mentions both doctrines, the doctrine of waiver is most applicable to the instant case.

Rapidigm cites to several unpublished decisions from Ohio appellate courts which have held that an employee's acceptance of compensation constituted an agreement to modify the original contract.  As stated above, there are genuine issues of material fact as to whether Becker and Rapidigm agreed to modify the 1999 Agreement.  Also as discussed above, the evidence that Becker received commission and practice profitability statements and continued to accept payments which did not include out of practice profits may support Rapidigm's interpretation of the contract.  However, the Court finds that the evidence that Becker was waiving his claim to the out of practice profits was not "clear, unequivocal or decisive."  Although Becker received the statements and accepted the payments, he continuously protested the out of practice distinction.

Based on the foregoing, Plaintiff Michael S. Becker's Motion for Partial Summary Judgment (Doc. 33) is hereby **DENIED** and Defendant Rapidigm, Inc.'s Motion for Summary Judgement.   (Doc. 34) is hereby **DENIED**.

      **SO ORDERED.**

                          _____/s/ Michael H. Watson_____
                          Michael H. Watson, Judge
                          United States District Court